In the Matter of the Complaint of AR-
KANSAS RIVER COMPANY, a corpora-
tion, as operator and/or owner pro hac
vice of the M/V Greenville, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. GC–90–CV–240.

United States District Court,
N.D. Mississippi,
Greenville Division.

Oct. 13, 1993.

Ernest Lane III, William R. Striebeck,
Greenville, MS, for Arkansas River Co.

Peter F. Frost, Dept. of Justice, Torts
Branch, Civ. Div., Washington, DC, Jim
Greenlee, Asst. U.S. Atty., Oxford, MS, for
U.S.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

Defendant, United States of Amer-
ica, has filed a motion for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Despite the fact that the government has moved for judgment on the pleadings, it has attached exhibits and affidavits which it advances in support of its motion. Likewise, Arkansas River Company, plaintiff, calls the court's attention to various exhibits and affidavits which it submits in response to the government's motion. A motion for judgment on the pleadings is a self-descriptive motion which aptly explains that the court's inquiry is strictly limited to the pleadings. However, Rule 12(c) allows the court to treat the motion as one for summary judgment when matters outside the pleadings are presented and not excluded by the court.

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed.R.Civ.Proc. 12(c).

This court will consider the exhibits and affidavits which the parties have submitted in the case *sub judice.* Hence, the government's motion will be evaluated as one for summary judgment under Rule 56.[1] As such, the court finds genuine issues of material fact, and the motion will be denied for the reasons explained in this memorandum opinion.

### Asserted Facts

On April 22, 1990, the M/V Greenville and her tow of eight loaded grain barges were proceeding southbound on the Arkansas River at approximately Mile 66.9, and were about to enter Lock 4 in the Pine Bluff,

Arkansas, region. At approximately 11:00 a.m., an outdraft (river current pushing from the right descending bank toward the left descending bank) caused the head of the Greenville's tow to be pushed to its port side with the stern of the tow being pushed to its starboard side. As a result, the stern of the Greenville's tow came into contact with a rock revetment causing the tow to strike the long wall on Lock 4. Arkansas River alleges that it sustained damages in an amount exceeding $800,000.00. The United States has a countersuit claiming damages of approximately $250,000.00 in damage to Lock and Dam 4.

Lock and Dam 4 is owned and operated by the United States government by and through the United States Corps of Engineers. Lock and Dam 4 is named the Emmett Sanders Lock and Dam, and it is part of the McClellan–Kerr Arkansas River Navigation System which consists of seventeen locks in the McClellan–Kerr Arkansas Navigational System with twelve locks in Arkansas and five in Oklahoma. All lock chambers are one hundred and ten (110) feet wide by six hundred (600) feet long and are operated twenty-four (24) hours a day seven days a week.

The Arkansas River gets shallower as it proceeds south, and there is a difference in the water level above and below the lock. Typically, a downward bound vessel will enter the lock with the downstream gates closed. After the vessel and her tow are secured in the lock, the upstream gates are closed. The water in the lock is then slowly released until the water level is approximately equal to the downstream water level. At that time, the downstream gates are opened and the tow is allowed to proceed downstream.

Arkansas River asserts that Lock 4 (Emmett Sanders) is merely a navigational lock and serves no purpose for flood control along the Arkansas River—a point which the gov-

---

1. The court's conversion of the government's Rule 12(c) motion as one for summary judgment will neither surprise nor prejudice either party. All parties are charged with having a working knowledge of the Federal Rules of Civil Procedure. Pursuant to Rule 12(c), if matters outside the pleadings are submitted to the court and the

court, in the exercise of its discretion, considers the submissions, then the court *must* treat the motion as one for summary judgment under Rule 56. F.R.C.P. 12(c); 5A Wright & Miller, § 1371 (1990). In the case *sub judice,* both parties submitted and invited the court's consideration of extraneous affidavits and exhibits.

ernment adamantly contests. According to the plaintiff, the allision was caused by the defective design of the lock and a total lack of maintenance on the part of the Corps of Engineers, including the failure to remove a rock point approximately one hundred and twenty-five (125) to one hundred and fifty (150) feet north of the entrance to the lock chamber. As explained in their memorandum brief, Arkansas River describes the Corps' negligence as follows:

> Both the long wall and the entrance to the lock are defectively designed and maintained, which causes a severe outdraft, which outdraft is a hazard to navigation and causes vessels and their tows to be pulled from the correct navigational path. Defendant United States has known of these design defects for many years and it has failed to properly maintain the entranceway to the lock chamber, even though numerous complaints have been filed by commercial towing interests. There have been numerous accidents at Lock and Dam 4, which were caused by the outdraft. Even though there have been 23 outdraft related accidents at Lock 4, the Corps of Engineers has failed to maintain the entranceway and its negligence in its failure to maintain the entranceway was the proximate cause of the allision. But for the negligence of the United States in its failure to use due care in maintaining the entranceway, the allision would not have occurred. Such inaction, after notice, was negligence in the grossest manner by the United States.

To support Arkansas River's assertions of the accident history at this particular location, the company has submitted a study performed by the Corps of Engineers. The study discusses the accident history at the Emmett Sanders Lock and Dam.

> The eight locks and dams had a total of 97 accidents upstream of their upstream miter gate. The results show that 23 of the total of 97 outdraft related accidents have occurred at Emmett Sanders Lock and Dam. The 97 accidents have resulted in a total of six barges sinking in front of the spillways, and three of the six barge sinkings occurred at Emmett Sanders

Lock and Dam. One of the barges that sank at Emmett Sanders Lock and Dam was an oil barge and this resulted in a major spill and clean-up effort. The 97 accidents have resulted in a total of 49 barges getting into the spillway areas and 21 of these, or approximately 43%, have occurred at Emmett Sanders Lock and Dam. These numbers indicate that of the eight locks and dams studied, the navigation conditions at the upstream lock approach to Emmett Sanders Lock and Dam are the most difficult to navigate.

The government relies upon two "defenses" which it asserts as a bar to suit. First of all, the government argues that plaintiff's complaint is barred by 33 U.S.C. § 702c, which precludes suits against the United States for damage caused by flood waters. As a fall-back position, the government alleges that the action is barred by the discretionary function exception to the Suits in Admiralty Act's waiver of sovereign immunity, 46 U.S.C. § 741–752. Upon careful consideration by the position asserted by the defendant, the undersigned is not convinced that as a matter of law, the government is entitled to judgment at this stage. However, before examining the merits of the government's defense, the court takes notice of the standard for summary judgment which is familiar and well-settled.

### Summary Judgment Standard

Summary judgment is appropriate only if the record reveals that there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c). The pleadings, depositions, admissions, answers to interrogatories, together with any affidavits, must demonstrate that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Federal. Sav. and Loan Ins. v. Kralj*, 968 F.2d 500, 503 (5th Cir.1992). The facts are re-

viewed drawing all reasonable inferences in favor of the non-moving party. *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). However, summary judgment is mandated after adequate discovery and upon proper motion against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552.

*Flood Control Act, 33 U.S.C. § 702c*

The Mississippi Flood Control Act of 1928 is placed in issue in the case *sub judice*. In a nutshell, numerous courts have traditionally held that no liability attaches to the government for any damage from floods or flood waters. The logical and natural extension of this premise is that no liability attaches to functions which are the result of flood control projects.[2] Section 3 of the Mississippi Flood Control Act, which is codified at 33 U.S.C. § 702c, furnishes the rule of "no liability" and is set forth below:

> Except when authorized by the Secretary of the Army upon the recommendation of the Chief of Engineers, no money appropriated under authority of sections 702a and 702g of this title shall be expended on the construction of any item of the project until the States or levee districts have given assurances satisfactory to the Secretary of the Army that they will (a) maintain all flood-control works after their completion, except controlling and regulating spillway structures, including special relief levees; maintenance includes normally such matters as cutting grass, removal of weeds, local drainage, and minor repairs of main river levees; (b) agree to accept land turned over to them under the provisions of section 702d of this title; (c) provide without cost to the United States, all rights of way for levee foundations and levees on the main stem of the Mississippi River between Cape Girardeau, Missouri, and the Head of Passes.

> **No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place:** Provided, however, That if in carrying out the purposes of sections 702a, 702b to 702d, 702e to 702g, 702h, 702i, 702j, 702k, 702l, 702m, and 704 of this title it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of the Army and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.

33 U.S.C. § 702c (1986) (emphasis added).

■ Although § 702c pertained to flood control along the Mississippi River, it is well settled that its grant of immunity is not limited to the Mississippi River and applies to all federal flood control projects nationwide. *See United States v. James*, 478 U.S. 597, 610 n. 10, 106 S.Ct. 3116, 3123 n. 10, 92 L.Ed.2d 483 (1986); *see also Aetna Ins. Co. v. United States*, 628 F.2d 1201 (9th Cir. 1980); *National Mfg. Co. v. United States*, 210 F.2d 263 (8th Cir.1954).

The seminal case which addresses the government's section 702c grant of immunity is *United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986), a consolidated appeal from two Fifth Circuit cases which came from the Eastern District of Texas and the Western District of Louisiana. In the Texas case, two waterskiers were injured and a rescuer from a ski boat drowned at the Millwood Reservoir and Dam located in the southwest corner of Arkansas. On June 8, 1979, Charlotte James and Kathy Butler were waterskiing in the basin area

---

**2.** As this opinion will note, the defining characteristics between flood control efforts; commercial; navigational; and recreational purposes involve fine line distinctions in which there is substantial disagreement among various jurisdictions.

where the water appeared deceptively calm.[3] However, the Corps of Engineers had designated the reservoir at flood stage for that day, and the Corps began releasing water through the "tainter gates" creating a swift, strong current toward the discharge. *James*, 478 U.S. at 599, 106 S.Ct. at 3118, 92 L.Ed.2d at 490. The ladies fell from their skis and started drifting toward the "tainter gates". Eddy Butler dove into the water in an attempt to save his wife, but the current was too strong and all three were pulled into the tainter gates. Mr. Butler drowned, and the two ladies were injured. *Id.* Respondents James and Butler filed suit in the Eastern District of Texas under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. Following a bench trial, the trial judge concluded that, consistent with 33 U.S.C. § 702c, a statute left unrepealed by the Federal Tort Claims Act, the government was immune from suit. The court came to this conclusion, despite the fact that the court found that; (1) the Corps had allowed a cable strung with orange buoys marking the danger area to drift away; (2) that white anchor buoys marking the restricted area were out of place and offered no warning; (3) that the death and injuries suffered were a classic example of conscious governmental indifference to the safety of the public. *James*, 478 U.S. at 600, 106 S.Ct. at 3118–19, 92 L.Ed.2d at 490–91.

In the Louisiana case, the waters of the Bayou Courtableau Basin Reservoir were at flood stage, and the Corps opened the gates in the project creating a strong current. *James*, 478 U.S. at 601, 106 S.Ct. at 3119, 92 L.Ed.2d at 491. Joseph and Kenneth Clardy were fishing in the basin, but they had already passed the only two faded signs which warned of the swift current at the entrance of the drainage structure when their boat was swept into dangerous waters. Kenneth Clardy was thrown into the approach basin

and drowned while being pulled through a two hundred and twenty (220) foot-long barrel of the drainage structure. *Id.* Susan Clardy, Kenneth's surviving spouse, brought an action in the Western District of Louisiana seeking damages under the Federal Tort Claims Act alleging failure to post adequate warnings. The government conceded it negligently failed to warn the decedent, yet the trial court granted summary judgment in favor of the government finding that the government was immune under § 702c from damages for personal injury caused by floods or flood waters in the negligent operation of flood control projects. *James*, 478 U.S. at 601–02, 106 S.Ct. at 3119, 92 L.Ed.2d at 491. Originally, a Fifth Circuit panel affirmed both cases. But then the Court of Appeals, sitting en banc, reversed the lower courts and held that Congress intended 702c to immunize the government for liability resulting directly from the construction of flood control projects and flooding caused by factors beyond the government's control. However, the Fifth Circuit found that Congress had not intended to shield negligent or wrongful acts of government employees either in the construction or in the continued operation of flood control projects.[4] *James v. United States*, 760 F.2d 590, 599, 603 (5th Cir.1985). The United States Supreme Court granted certiorari to resolve a split among the circuits regarding the scope of immunity afforded by § 702c. In Justice Powell's majority opinion, the question before the Court was posed as follows:

> This case presents the question whether the Flood Control Act's immunity provision in 33 USC § 702c [33 USCS § 702c], which states that '[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place,' bars recovery where the Federal Government would otherwise be liable under the Federal Tort

---

3. According to the facts as recited in the opinion, the Millwood Reservoir is used for swimming, boating, and waterskiing, and the government promotes recreational use of the facility. *James*, 478 U.S. at 599, 106 S.Ct. at 3118, 92 L.Ed.2d at 490.

4. In a strongly worded dissent, Judge Gee, joined by Judge Jolly, Judge Davis and Judge Hill, rea-

soned that the majority's interpretation of § 702c was contrary to the statute's plain words. That is, Congress had blanketed the government with a grant of immunity in 702c consistent with Congressional intent and the legislative history of § 702c. *James v. United States*, 760 F.2d 590, 604 (5th Cir.1985).

Claims Act, 28 USC § 2671 et seq. [28 USCS § 2671 et seq.], for personal injury caused by the Federal Government's negligent failure to warn of the dangers from the release of flood waters from federal flood control projects.

*United States v. James*, 478 U.S. 597, 598–99, 106 S.Ct. 3116, 3118, 92 L.Ed.2d 483, 489 (1986).

The Supreme Court held, applying the plain language of § 702c, that immunity for the government existed since both cases from the Fifth Circuit involved the release of waters from reservoirs that had reached flood stage. *James*, 478 U.S. at 604, 106 S.Ct. at 3121, 92 L.Ed.2d at 493. Commenting on § 702c's grant of immunity, the Court stated:

> The Act concerns flood control projects designed to carry flood waters. It is thus clear from § 702c's plain language that the terms 'flood' and 'flood waters' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control. As both District Courts found, the waters here clearly fall within the ambit of the statute.

*United States v. James*, 478 U.S. 597, 605, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483, 494 (1986). Respondents Butler and James had argued that if § 702c was intended to grant immunity in connection with flood control projects, then no immunity applied to their injuries since such injuries arose from mismanagement of a recreational facility. The Court rejected this theory by noting that the lower courts had determined that the release of waters in both cases related to flood control as part of the management of a flood control project. *United States v. James*, 478

U.S. 597, 609–10, 106 S.Ct. 3116, 3123, 92 L.Ed.2d 483, 496 (1986).[5]

While the *James* decision provided some guidance to the lower courts when faced with § 702c applicability, the various district and circuit courts reached inconsistent results in applying the rule of *James*. Each case wherein the government invokes § 702c's cloak of immunity involves a fact sensitive process. This is best illustrated by a review of district court and circuit court treatment of § 702c following the *James* decision.

In *Williams v. United States*, 957 F.2d 742, 743 (10th Cir.1992), plaintiff's husband and two sons drowned while fishing in the Verdigris River downstream of the Newt Graham Lock and Dam 18 of the McClellan–Kerr Arkansas River Navigation System. At the time in question, the tainter gates were releasing 12,000 cubic feet of water per second, which posed no threat to the fishermen. However, in the course of moving a tug or tow boat with barges downstream through the lock, the operator released an additional 6,000 cubic feet per second, and Mrs. Williams' husband and two sons were swept away and drowned. *Williams*, 957 F.2d at 743. The Tenth Circuit criticized the lower court for focusing first and foremost on whether the water involved in the injury was floodwater at the moment of injury or at any prior time. Instead, the proper focus should have been;

> not on the character or origin of the water, but on the purpose of the project and the nature of the activity creating the nexus with the injury ... An approach that elevated the character of the water over the purpose of the dam or levee would lead to absurd results.

*Williams*, 957 F.2d at 744.[6] Upon examination of the record before the court, the Tenth

**5.** Justice Stevens wrote a dissent in *James* in which Justices Marshall and O'Connor joined. Under the view of the dissent, § 702c immunity covered only damage to property, not personal injury losses suffered by the plaintiffs in both cases. *United States v. James*, 478 U.S. 597, 613, 106 S.Ct. 3116, 3125, 92 L.Ed.2d 483, 498 (1986).

**6.** The court cited several decisions which demonstrated that the threshold question centered on the purpose of the project and the nature of the

activity which resulted in the injury. *See Dawson v. United States*, 894 F.2d 70, 71 (3d Cir. 1990) (project created pursuant to Flood Control Act of 1938, and Corps monitored water on daily basis to determine how much water to release through dam); *Boyd v. United States*, 881 F.2d 895, 899 (10th Cir.1989) (lake in question created by Corps for flood control purposes); *Dewitt Bank & Trust Co. v. United States*, 878 F.2d 246, 247 (8th Cir.1989) (flood control was essential component of multiple purpose project); *McCarty v. United States*, 850 F.2d 558, 559 (9th Cir.

Circuit concluded that the McClellan–Kerr lock and dam had no flood control capabilities; and, therefore, the government did not have the benefit of § 702c's grant of immunity. *Williams,* 957 F.2d at 745.[7] *See Henderson v. United States,* 965 F.2d 1488, 1492 (8th Cir.1992) (§ 702c was no bar to recovery for widow of fisherman; primary purpose of operating dam was generating electric power). *But see Zavadil v. United States,* 908 F.2d 334, 336–36 (8th Cir.1990) (*one* purpose of Gavins Point Dam was flood control and navigation; thus, diver who was rendered quadriplegic when he struck submerged concrete boat ramp could not maintain suit); *Fryman v. United States,* 901 F.2d 79, 80, 82 (7th Cir.1990) (although sharply critical of the Supreme Court's analysis in *James* and that of the Tenth Circuit in *Boyd,* Seventh Circuit found that "every drop of water" in Lake Shelbyville was "flood water" and that water level played a "substantial part" in inducing injuries sustained by plaintiff); *Powers v. United States,* 787 F.Supp. 1397, 1399 (M.D.Ala.1992) (so long as project is authorized for flood control purposes and damage or injury is related to use of that project, § 702c immunity attaches).

Subsequent to the Supreme Court's decision in *James,* the Fifth Circuit with a three judge panel,[8] revisited § 702c immunity in *Mocklin v. Orleans Levee District,* 877 F.2d 427 (5th Cir.1989). In *Mocklin,* Louis and Maria Mocklin brought suit under the Federal Tort Claims Act to recover damages for the death of their son who drowned in the tidal basin of Lake Pontchartrain. The child slipped from a sand bar created by dredging work and drowned in a flotation channel. At the time of the accident, the Corps had contracted with a private company to reinforce levees along the lake. The artificial sand bar and the excavation of flotation channels for barge traffic were the result of the work under contract. *Mocklin,* 877 F.2d at 428.

The plaintiff conceded, and thus stipulated himself out of the courthouse, that the work being done was part of a flood control project. *Mocklin,* 877 F.2d at 428 n. 1.

> our sole inquiry to determine whether the Corps is immune from liability is whether the Mocklins' son drowned 'from or by' 'flood water' within the meaning of § 702c. We conclude that he did....

> \*    \*    \*    \*    \*    \*

> The flotation channel in which the Mocklins' son drowned clearly contained 'flood waters' within § 702c of the FCA because it was created as part of a flood control project.

*Mocklin,* 877 F.2d at 429, 430.

■  In March of 1992, Justice Stevens issued a dissenting memorandum to the Court's denial of certiorari in a case that originated from the Ninth Circuit Court of Appeals. In the memorandum, Justice Stevens noted inconsistent application of § 702c in the courts of appeals in wake of the Court's decision in *James.* To resolve the inconsistencies, Justice Stevens advocated granting the writ to resolve the conflicts in § 702c applicability.

> Petitioner asks us to resolve a recurring conflict among the courts of appeals concerning the meaning of a once obscure sentence in· § 3 of the Mississippi Flood Control Act of 1928. During the past decade that sentence has assumed greater and greater importance because it has provided the Government with a defense to claims for personal injury and death caused by federal negligence, gross negligence, and even 'conscious governmental indifference to the safety of the public.' *United States v. James,* 478 US 597, 600, 92 L Ed 2d 483, 106 S Ct 3116 [3118] (1986) (citation and internal quotation marks omitted).

---

1988) (lake was flood control project; Corps monitored lake's water level on daily basis).

**7.** In reaching this determination, the court considered; (1) the statute which authorized the facility referred to navigation or flood control in the disjunctive; (2) the government's rules and regulations governing public use of the waters referred to navigable reservoir areas, not flood

waters or flood control; (3) the project was not listed as one subject to federal flood control regulations at 33 C.F.R. § 208.11 (1991). *Williams v. United States,* 957 F.2d 742, 744–45 (10th Cir.1992).

**8.** Judge Clark, Chief Judge, and Judges Williams and Davis.

This is the latest in an expanding series of tragic cases. Jerome Hiersche, a professional diver, contracted with the Government to inspect submerged fish screens at the hydroelectric intake on the John Day Dam on the Columbia River between Oregon and Washington. Although Government employees assured him that the water flow to the fish bypass system would be shut off, they negligently failed to do so. Petitioner's head was drawn into an orifice in the fish bypass system, and he suffered fatal injuries....

[...] In some Circuits the Government's flood-control immunity would not constitute a defense in the case of injuries resulting from Government conduct that was unrelated to any flood-control purpose, see, e.g., *Boyd v. United States ex rel. United States Army, Corps of Engineers,* 881 F2d 895 (CA10 1989); *Hayes v. United States,* 585 F2d 701 (CA4 1978). If this case had arisen in one of those Circuits, the claim would likely succeed because Hiersche's assignment related to fish conservation and power generation, rather than flood control. But in the Ninth Circuit, if flood control was one of the purposes of the act of Congress authorizing the project itself, the immunity applies. The Seventh Circuit has suggested that immunity might depend on whether the flood-control activities at the project in-

creased the probability of injury. See *Fryman v United States,* 901 F2d 79 (CA7), cert denied, 498 US 920, 112 L Ed 2d 249, 111 S Ct 295 (1990).

This Court has a duty to resolve conflicts among the courts of appeals....

*Hiersche v. United States,* — U.S. —, — – —, 112 S.Ct. 1304, 1305, 117 L.Ed.2d 525, 526–27 (1992) (Stevens, J.). Justice Stevens' dissenting memorandum provides an excellent illustration of the inconsistent application of § 702c by the courts of appeal and district courts. However, despite any ambiguities which have developed in the circuits, the common thread which *James* emphasized, and recognized by the Fifth Circuit,[9] is the required nexus between the claimed injuries and the management of a flood control project for maintenance of flood waters.[10] *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3121–22, 92 L.Ed.2d 483, 494 (1986). With that in mind, the court now turns its attention to the specific claims in the case at bar.

According to the government, flood control is one of the "primary purposes" of the McClellan–Kerr Arkansas River Navigation Project. To support this position, the government offers excerpts from the House and Senate reports on the Rivers and Harbors Bill of 1946.

Congress has approved the construction of projects in the interest of flood control

---

9. *Mocklin,* 877 F.2d at 430.

10. In the government's brief, the United States argues that the proper legal test is as follows: Immunity applies unless the plaintiff can show that the conduct or activities that caused the injury were "wholly unrelated" to an act of Congress authorizing federal funds for flood control. In support of its assertion, the government cites *Dawson v. United States,* 894 F.2d 70, 74 (3d Cir.1990), and *Morici Corporation v. United States,* 681 F.2d 645, 647–48 (9th Cir.1982). *Morici* was cited in a footnote in the *James* opinion. *See United States v. James,* 478 U.S. 597, 605 n. 7, 106 S.Ct. 3116, 3121 n. 7, 92 L.Ed.2d 483, 494 n. 7 (1986). However, there is nothing in *James* to seriously suggest that this "wholly unrelated" test is the proper standard. For a sharp criticism of the "wholly unrelated" test as employed by the Tenth Circuit in *Boyd v. United States,* 881 F.2d 895, 889–900 (10th Cir. 1989), see the Seventh Circuit's opinion in *Fryman v. United States,* 901 F.2d 79, 82 (7th Cir. 1990).

As explained in this opinion, this court will employ the test it believes is the correct standard as explained by the United States Supreme Court in *James.* Having stated that, the court acknowledges that the Fifth Circuit in *Mocklin v. Orleans Levee District,* 877 F.2d 427, 430 n. 6 (5th Cir. 1989), commented on the "wholly unrelated" "test". "It is the operation [flood control project] and not the injury [to plaintiff] that must be 'wholly unrelated' to flood control for the FCA not to apply." *Mocklin,* 877 F.2d at 430 n. 6. The undersigned does not perceive this footnote reference by the Fifth Circuit to be an adoption of the "wholly unrelated" test. The court's understanding is that its inquiry should be focused on the operation, or not, of a flood control project for the maintenance of flood waters wherein some injury resulted to plaintiff. This is "the test", as discussed in *James,* that the court will apply until there is further clarification by the Supreme Court or the Fifth Circuit to the contrary.

at an estimated cost of $76,560,000. The report now submitted is comprehensive in scope. The plan of improvement is a multiple-purpose plan consisting of coordinated developments to serve navigation, produce hydroelectric power, afford additional flood control, and provide related benefits in connection with other activities such as recreation and wildlife propagation.

\* \* \* \* \* \*

The multiple-purpose plan would provide average annual direct and indirect flood-control benefits in the Arkansas River Basin and along the Mississippi River totaling $912,800 in excess of the benefits to be obtained from previously authorized, approved, and recommended works including those which are incorporated in the plan.

H.R.Rep. No. 2009, 79th Cong., 2d Sess., at 28, 29 (1946); S.Rep. No. 1508, 79th Cong., 2d Sess. at 32, 33 (1946).[11]

In the preamble to the Public Law[12] which authorized the McClellan–Kerr Arkansas River Project, the flood control aspects of the project were noted; however, the navigational aspects of the project were more prominently discussed than flood control.

[T]he provisions of section 1 of the River and Harbor Act approved March 2, 1945 (Public, Numbered 14, Seventy-ninth Congress, first session), shall govern with respect to projects herein authorized; and the procedures set forth with respect to plans, proposals, or reports for works of improvement for navigation or flood control and for irrigation and purposes incidental thereto shall apply as if herein set forth in full: And provided further, That the word 'navigation' appearing in paragraph (b) of section 1 of the River and Harbor Act approved March 2, 1945 (Public, Numbered 14, Seventy-ninth Congress,

first session), shall in respect to the Arkansas River and tributaries include the use of water herein referred to for power purposes:

\* \* \* \* \* \*

Arkansas River and tributaries, Arkansas and Oklahoma: The multiple-purpose plan recommended in the report of the Chief of Engineers dated September 20, 1945, and letter of the Chief of Engineers dated March 19, 1946, is approved, and for initiation and partial accomplishment of said plan there is hereby authorized to be appropriated the sum of $55,000,000;

60 Stat. 634, 635–36 (1946).

In support of its position that "flood waters" were responsible, in large measure, for the allision involving the M/V Greenville on April 22, 1990, the Corps emphasizes that the accident occurred in the spring of the year during a time referred to as "high flow". According to the Corps, the engineers operate the gates in a condition known as "open river" to provide adequate discharge of water from flood control releases of upstream reservoirs. Specifically, the Corps offers the affidavit of Mr. Jack Woolfolk, Assistant Chief of Engineering for the Little Rock District. Mr. Woolfolk, a thirty-two year veteran engineer with the Corps, stated that he was the former Chief of the River Development Section until that section was abolished in 1989. According to Mr. Woolfolk, the purpose of the McClellan–Kerr Arkansas River Navigation Project was to carry out the requirements of the Flood Control Act of July 24, 1946, with respect to the Arkansas River Basin. "The project has multiple purposes, including flood control and assistance to navigation."[13] Mr. Woolfolk described the conditions at Lock and Dam 4 as follows:

---

**11.** The government's reliance upon the House and Senate Reports on the Rivers and Harbors Bill of 1946 to bolster its position that flood control was a primary purpose of the McClellan–Kerr project is somewhat erroneous. Actually, the reports indicate that flood control was more of an incidental benefit of the project. The estimated annual savings in transportation and navigation charges for the project were estimated at $19,606,000.00; estimated annual electric power benefits were valued at $5,586,500.00; flood

control savings were estimated at $912,800.00, annually; and land rental benefits were valued at an annual return of $260,000.00. H.R.Rep. No. 2009, 79th Cong., 2d Sess., at 29 (1946); S.Rep. No. 1508, 79th Cong., 2d Sess., at 33 (1946).

**12.** 60 Stat. 634 (1946) (Ch. 595, Pub.Law 525, H.R. 6407, July 24, 1946).

**13.** Affidavit of Jack Woolfolk.

8. Flood control releases from the reservoirs in the McClellan–Kerr project are regulated by stages at Van Buren, Arkansas. I have examined project operating records and records of flow conditions at Lock and Dam Number 4 in this case. Those records indicate that the Arkansas River had been above flood stage on the Van Buren gage since March 12, 1990. On April 22, 1990, the day of the accident in this case, the upstream lakes were releasing flood waters and the project was operating at 'open river' conditions, with all dam gates out of the water and flood waters being allowed to flow freely to avoid overtopping the dams. Consequently, flow conditions at Lock and Dam Number 4 were approximately 225,000 cfs.

Affidavit of Jack Woolfolk.

The plaintiff takes strong issue with the government's contention that McClellan–Kerr Arkansas River Navigation System, more specifically Lock and Dam 4, is anything other than what its name suggests—a *navigational* system.

The government cannot seriously contend that Lock and Dam 4 is not a navigational aid or deny that the sole purpose of the lock is to aid or assist navigation....

\* \* \* \* \* \*

Without question, the operation of navigational Lock and Dam 4 at the time of the M/V GREENVILLE'S allision, was for the purpose of commercial navigation, and not flood control. Arkansas River Company has alleged that the cause of the allision was the government's failure to maintain the approach and entranceway to Lock 4. This has absolutely nothing to do with flood control. We are talking about an 'outdraft' caused by the failure of the government to exercise due care in maintaining Lock 4 and its entranceway. Neither the lock nor the entranceway are related to flood control.... The Arkansas River was rising on April 22, 1990, however, it was not a flood and the water was within the banks of the Arkansas River between Locks and Dams 4 and 5. Therefore, since the M/V GREENVILLE allision was not caused '... by floods or flood waters,'

there is no immunity pursuant to section § 702(c) [702c].

To support its position, Arkansas River has submitted affidavits and engineering reports which indicate that the project was, and is, a navigational plan rather than one for flood relief. For example, in October 1966, a Corps of Engineers Technical Report describes the McClellan–Kerr Arkansas River plan as a project to serve navigation, produce hydroelectric power, "afford additional flood control," and for recreation and conservation of fish and wildlife. Exhibit A. Additionally, the same report describes Lock and Dam 4 as "one unit of the navigation portion of the multipurpose plan for development of the Arkansas River." In April of 1977, the United States Senate, Committee on Environment and Public Works, requested that the Corps provide information regarding the cost of various federal projects. In response to the committee's request, Colonel Marvin W. Rees, Executive Director of Civil Works, listed the McClellan–Kerr Arkansas River Navigation System as an "inland navigation project". In the letter to the senate committee, Col. Rees described the purposes of such projects as navigation, hydropower, water supply, and recreation. Conspicuous by its absence is any mention of flood control interests served by the project. Exhibit B.

Plaintiff's Exhibit D contains a study and report of the Emmett Sanders Lock and Dam 4 prepared by the Corps of Engineers. The study discusses the poor accident history at Lock and Dam 4 and contains repeated references to the McClellan–Kerr project and Lock and Dam 4 as a navigation system. Flood control capacities, if any, are not discussed in the study.

Additionally, Arkansas River has attached two affidavits, one from a former Coast Guard official and the other from a veteran river boat operator on the Arkansas River. Mr. Billy Harbison, President of Arkansas River Company, has been active in the riverboat industry on the Arkansas River since 1965. Mr. Harbison has a strong familiarity with all of the navigational locks and dams on the river, and he has attended various industry meetings regarding the McClellan–Kerr

system. According to Mr. Harbison, the only purpose of Lock and Dam 4 is to assist commercial navigation on the river. The affiant's statement is based upon his information, education, training and employment in the riverboat industry for approximately thirty years. The second affidavit was submitted by Douglas R. Halsey, a thirty year veteran and retired Lieutenant Commander with the United States Coast Guard. At the time of his retirement in 1984, affiant was the Commander of the Marine Safety Office, U.S. Coast Guard, Greenville, Mississippi. Based upon his personal knowledge and information made available to him in his thirty years of maritime training and employment, Commander Halsey stated that the sole purpose of navigational Lock and Dam 4 was to assist, aid and allow navigation on the McClellan–Kerr Arkansas River Navigation System. In his affidavit, Commander Halsey discussed the basis of his knowledge.

8. [...] The navigational lock at Lock and Dam 4 was constructed for navigational purposes, only, and the lock does not control flooding.

9. The *sole* purpose of the navigational locks are to assist, aid and allow navigation on the McClellan–Kerr Arkansas River Navigation System.

10. Lock and Dam 4 (Emmett Sanders Lock and Dam) regulations are prescribed by the Secretary of the Army and the use, administration and navigation of the structures shall be under the direction of the Army Corps of Engineers. The regulations do not discuss flood or flood control in the use, operation and maintenance of the lock.

11. The regulations governing the navigation of the locks is included in the navigation charts for the McClellan–Kerr Arkansas River Navigation System which are issued by the United States Army Corps of Engineers, Little Rock District.

\*    \*    \*    \*    \*    \*

19. All design memorandum that has been made available to Affiant specified that the lock at the Emmett Sanders Lock and Dam is a 'Navigation Lock.'

\*    \*    \*    \*    \*    \*

21. At a river flow of approximately 175,-000 to 200,000 CFS, all gates on Lock and Dam 4 are open on the dam, in order to aid navigation and there is no regulation of flow for flood control above 175,000 to 200,000 CFS.

22. The flow at that time of the incident in question was approximately 220,000 CFS, therefore, there was no regulation of the water, other than in the navigational lock, which had no connection with flood control.

23. According to Technical Report No. 2–746, prepared by the U.S. Army Corps of Engineers in October 1966, 'Lock and Dam No. 4 is one unit *of the navigational portion* of the multipurpose plan for the development of the Arkansas River.' (p.2). According to the same technical report, the maximum navigation stage is based on a 10 year frequency flood of 350,000 CFS. Thus, the incident of April 22, 1990 occurred below maximum navigational flood stage.

24. [...] According to Exhibit 'A', the outdraft problem is caused by the right descending shore line and not 'flood waters.'

\*    \*    \*    \*    \*    \*

26. [...] I have seen no documents that indicate that the Flood Control Act has any application or relevance whatsoever to a navigational accident at a navigational lock and dam, such as the M/V GREENVILLE'S allision with the Emmett Sanders Lock and Dam on April 22, 1990.

■ As demonstrated by the positions of the parties and the respective proof that each has submitted, there is a genuine issue of material fact regarding the maintenance and operation of Lock and Dam 4 on the Arkansas River. Specifically, does the lock and dam serve a flood control role as a component of the McClellan–Kerr System; or, is its function more narrowly defined as an instrument of passage for commercial river traffic? The record before the court reveals a good faith dispute of this material, and determinative, question of fact. It goes without saying that summary judgment disposition of this

issue, without additional evidence, would be premature.

### Discretionary Function Immunity

As an alternate position, the Corps argues that it is immune from suit under the discretionary function exception of governmental waivers of immunity. Of course, it is well settled that the United States cannot be sued except as it consents to suit. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969); *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). If sovereign immunity applies, then subject matter jurisdiction is lacking. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969).

In the case *sub judice,* Arkansas River alleges jurisdiction under the Admiralty Jurisdiction Act, codified at 46 U.S.C. § 740 *et seq. See Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). The Admiralty Jurisdiction Act recognizes limited waivers of the federal government's sovereign immunity. *See* 46 U.S.C. § 740 (1975). However, like the Federal Tort Claims Act, immunity is not waived for tort claims based upon the discretionary functions of government. *Graves v. United States,* 872 F.2d 133 (6th Cir.1989); *In re Ohio River Disaster Litig.,* 862 F.2d 1237 (6th Cir.1988); *Wiggins v. United States,* 799 F.2d 962 (5th Cir.1986); *Gemp v. United States,* 684 F.2d 404 (6th Cir.1982); *Callas v. United States,* 682 F.2d 613 (7th Cir.1982); *Canadian Transport Co. v. United States,* 663 F.2d 1081 (D.C.Cir.1980); *Bearce v. United States,* 614 F.2d 556 (7th Cir.1980); *Chute v. United States,* 610 F.2d 7 (1st Cir.1979). The statutory scope of the discretionary function is defined as follows:

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1965).

Arkansas River concedes that the decision to construct Lock and Dam 4 was a discretionary function. However, once constructed, the government was under a duty of due care for the maintenance and operation of the facility. Citing *Complaint of Walker's Midstream Fuel,* 636 F.Supp. 339, 349 (W.D.Ky.1986), plaintiff describes the government's duty as follows:

The United States constructed the Smithland Locks and Dam as an aid to navigation on the Ohio River. The government had no duty to provide such a navigational aid. However, after it exercised its discretion and constructed the locks and dam, it was obligated to exercise due care in their maintenance and operation and subjected itself to liability for negligent performance of those activities. *See Indian Towing Company v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955). *See also, Drake Towing Co., Inc. v. Meisner Marine Const. Co.,* 765 F.2d 1060, 1064 (11th Cir.1985); *Butler v. United States,* 726 F.2d 1057, 1063 (5th Cir.1984); *Southern Natural Gas Co. v. Pontchartrain Mat.,* 711 F.2d 1251, 1254 (5th Cir.1983); *Neal v. Bergland,* 646 F.2d 1178, 1182 (6th Cir.1981); *Seaboard Coast Line R.R. Co. v. United States,* 473 F.2d 714, 716 (5th Cir.1973).

In *Walker's Midstream Fuel,* the Corps' negligent maintenance consisted of its failure to remove longwall closure panels which were installed during the construction of a dam. *Walker's Midstream Fuel,* 636 F.Supp. at 349. Similarly, Arkansas River asserts that the negligent maintenance in the case at bar is the failure to properly maintain the right descending shore along the approach to the

lock and dam.[14] In addition to *Walker's Midstream Fuel, supra,* Arkansas River directs the court's attention to *Arkansas River Company v. CSX Transportation,* 780 F.Supp. 1138 (W.D.Ky.1991). In *CSX,* the Kentucky district court discussed the distinctions between discretionary (immune) functions and operational (non-immune) decisions. *CSX Transp.* 780 F.Supp. at 1140. The court noted that every action by the government involves some measure of discretion. However, some parameters can be established.

> Since every action or inaction by the government involves some exercise of discretion, a planning/operational distinction has been articulated to determine whether the action falls within the exception. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *In re Ohio River Disaster Litigation,* 862 F.2d 1237 (6th Cir.1988). Planning decisions, which involve questions of policy, and the evaluation of the financial, political, economic and social effects of a given policy, are immune from judicial scrutiny. On the other hand, operational decisions, which involve the normal day-to-day operations of the government, are subject to judicial scrutiny. *Complaint of Walker's Midstream Fuel,* 636 F.Supp. 339 (W.D.Ky.1986). The basic inquiry is whether the challenged acts are of the nature and quality that Congress intended to shield from liability. *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

*Arkansas River Company v. CSX Transp.,* 780 F.Supp. 1138, 1140 (W.D.Ky.1991). In *CSX Transportation,* the court concluded that discretionary immunity did not extend to the government's inspection and maintenance of a fender system on a bridge abutment in the middle of a busy river. *CSX Transp.,* 780 F.Supp. at 1141. The activity, or function, (inspection and maintenance of a fender system), furnished no strong nexus with any significant financial, political, economic, or social interests or consequences. Similarly, Arkansas River argues that the same nexus is lacking with the government's negligent maintenance of the approachway to Lock and Dam 4. While Arkansas River concedes that the site selection and design of the lock and dam entail discretionary, policy considerations,[15] the government's alleged failure to employ due diligence in maintaining and inspecting the lock and dam, once constructed, is not excused under the discretionary umbrella. The undersigned agrees that this is a correct statement of the law. The government is still held to a standard of due care for the operational functions of the lock and dam.[16] However, application of this standard to the facts of any given case can become an exasperating exercise involving subtle, fine-line distinctions. Nonetheless, the court is obligated to review the facts in the record, and all reasonable inferences, in the light most favorable to the nonmovant (Arkansas River). Having done so, the court is not prepared to conclude that all acts of negligence alleged by the plaintiff concern discretionary, immune functions requiring significant elements of choice between competing policy considerations grounded in social, economic, or political interests. *See United States v. Gaubert,* 499 U.S. 315, 335, 111 S.Ct. 1267, 1280, 113 L.Ed.2d 335, 354 (1991) (Scalia, J., concurring in part). As the court understands the record, plaintiff's claims of negligence address; (1) negligent maintenance of the right descending shore on the approach to the lock and dam, and possibly; (2) negligence in the amount of water discharged through lock and dam on the day in question. On both issues, the government has not convinced the court that it entitled to judgment as a matter of law for the lack of subject matter jurisdiction based upon the doctrine of discretionary immunity. For

---

**14.** According to Arkansas River, the problem with the right descending shore caused the outdraft.

**15.** Arkansas River's brief at 18.

**16.** Discretionary choices are immune even if such choices occur at the "operational level." *United States v. Gaubert,* 499 U.S. 315, 326, 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335, 349 (1991). *Gaubert* reaffirmed the old line of cases which attempt distinctions between immune, discretionary functions involving choice or judgment versus non-immune, operational functions where no choice is involved. *Gaubert,* 499 U.S. at 323–24, 111 S.Ct. at 1274, 113 L.Ed.2d at 347.

now, Arkansas River has cleared the summary judgment hurdle. At trial, the court fully anticipates that the evidence will more clearly define to the court's satisfaction the plaintiff's position regarding the government's operational negligence and maintenance and the government's claim of immunity under the discretionary function exception.

### Conclusion

For the reasons stated in this opinion, the government's motion pursuant to Rule 12(c) is treated by the court as one for summary judgment under Rule 56. As such, the motion will be denied. This case will proceed in the usual course consistent with the Federal Rules of Civil Procedure. At this point in the litigation, the government's claim that it is immune from suit under 33 U.S.C. § 702c and the discretionary function exception to tort liability is unpersuasive. An Order consistent with this memorandum opinion will be issued this day.