**ARKANSAS RIVER COMPANY, A Corporation, as Operator and/or Owner Pro Hac Vice of the M/V Greenville, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 4:90CV240–D.

United States District Court, N.D. Mississippi, Greenville Division.

Nov. 14, 1996.

Ernest Lane III, William R. Striebeck, Greenville, MS, for Arkansas River Co.

Peter F. Frost, Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, Jim Greenlee, Asst. U.S. Atty., Oxford, MS, for U.S.

### BENCH OPINION

DAVIDSON, District Judge.

This nonjury matter came to trial before the undersigned on September 9, 1996, in Aberdeen, Mississippi. The plaintiff Arkansas River Company ("ARC") brought suit against the defendant United States for damages due to the United States Army Corps of Engineers' ("Corps") alleged negligence in maintenance and design of the Emmett Sanders Lock and Dam on the Arkansas River ("Lock and Dam 4"). The defendant counter-claimed with an assertion of negligence and requested a sum sufficient to repair the damage done to Lock and Dam 4 when a tow under the control of Arkansas River allided with the lock and dam. This court has jurisdiction pursuant to Federal Rule of Civil Procedure 9(h) and the Suits in Admiralty Act, 46 U.S.C.App. §§ 740 *et seq.* ("SAA").[1] The defendant's counter-claim is

---

1. This Act waives sovereign immunity to a certain extent, providing:

    [i]n cases where if [a United States] vessel were privately owned or operated, or if [United States] cargo were privately owned or possessed, or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States....

46 U.S.C.App. § 742; *Gordon v. Lykes Bros. S.S. Co.*, 835 F.2d 96, 98 (5th Cir.1988). This court

brought pursuant to 28 U.S.C. § 1345 and the Rivers and Harbors Act, 33 U.S.C. §§ 408, 412. The court sets out below its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### FACTUAL FINDINGS

ARC, a Mississippi corporation domiciled in Greenville, Mississippi, is the owner and operator of the M/V GREENVILLE ("GREENVILLE"), a 3800–horsepower towing vessel used to push [2] barges on the inland waterways of the United States. Lock and Dam 4 is owned by the United States and operated by the Corps. It was constructed over forty (40) years ago at approximately mile 66.9 on the Arkansas River in the McClellan–Kerr Arkansas River Navigation Project. This System consists of seventeen locks, twelve in Arkansas and five in Oklahoma, with uniform chambers 110 feet wide by 600 feet long. The locks are operated twenty-four (24) hours a day, seven (7) days a week.

As it snakes southward, the Arkansas River gradually becomes more shallow. As a result, for navigational purposes, the water level is different above and below the lock. Generally, a downward bound tow will enter a lock with the downstream gates closed. Once the tow maneuvers into the lock, the upstream gates are closed and the water is released from the chamber until the level inside is equal to the downstream level. At that point, the downstream gates are opened and the tow proceeds downstream.

On April 22, 1990, the water flow rate at Lock and Dam 4 was 200,000 to 220,000 cubic feet per second ("CFS"). Upstream release of pool water attributed to the higher flow rate. That morning the M/V GREENVILLE, piloted by Captain Wayne Stricklin, was heading south on the Arkansas River and approached Lock and Dam 4 from the north. Approximately 200 TO 250 feet above the lock, the tow drifted into an outdraft in the river and became misaligned with the lock. An outdraft occurs when the normal downstream current of the river is somehow altered and an alternate current is created. The majority of the upstream approaches on the Arkansas River experience some sort of outdraft condition. The outdraft which occurred 250 feet upstream of Lock and Dam 4 was created by the shape of the right descending bank line. Part of the bank line thrust further out into the river, creating an obstacle around which the river current had to swirl. When the downstream current ran into that part of the bank, its kenetic force pushed it away from the bank and out into the river, creating a cross current or outdraft at that particular point in the river.

The GREENVILLE was towing eight (8) barges when the outdraft above Lock and Dam 4 caught it. The conditions of the current pushed the head of the tow to its port (left) side, while the tow's stern swung to the starboard (right) side. Captain Stricklin immediately began to back the tow and, as a result, the stern came in contact with the rock revetment on the right descending bank and the head of the tow struck the long wall or guide wall of Lock and Dam 4. The allision with the guide wall broke the tow up, sinking one barge and damaging several others.

ARC sued the United States alleging that the outdraft condition north of Lock and Dam 4 was a navigational hazard of which the Corps was aware, that the Corps had a duty to attempt to correct navigational hazards and that the Corps failed to take any action to alter or repair the right descending bank line upstream of Lock and Dam 4 prior to April 22, 1990. The United States responded by alleging that the negligence of Captain Stricklin caused the allision and that ARC owes the United States for the damages caused to the lock and dam by the GREENVILLE and its loosed barges. Furthermore, the United States submits that this court lacks jurisdiction over the plaintiff's claims pursuant to section 3 of the

previously referred to the Act as the "Admiralty Jurisdiction Act." *Arkansas River Co. v. United States,* 840 F.Supp. 1103, 1114 (N.D.Miss.1993). Both names refer to the same statutory waiver of immunity.

**2.** A towing vessel actually pushes the barges in front of it instead of literally "towing" them behind.

Flood Control Act of 1928, 33 U.S.C. § 702c, which immunizes the United States from liability for any damage resulting from river floodwaters or the operation of a flood control project. The United States also asserts that the discretionary function exception to the Federal Tort Claims Act ("FTCA") (28 U.S.C. § 2680(a)) precludes this court from exercising subject matter jurisdiction over the plaintiff's claims.

## CONCLUSIONS OF LAW

### I. MISSISSIPPI FLOOD CONTROL ACT OF 1928, 33 U.S.C. § 702c

The United States claims that it is immune from liability in this action due to the application of the Mississippi Flood Control Act of 1928. *See* 33 U.S.C. § 702c. That Act provides in relevant part that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." *Id.* Although the Act pertains to flood control along the Mississippi River, its grant of immunity extends to all federal flood control projects nationwide. *United States v. James*, 478 U.S. 597, 610 n. 10, 106 S.Ct. 3116, 3123 n. 10, 92 L.Ed.2d 483 (1986); *Arkansas River Co. v. United States*, 840 F.Supp. 1103, 1106 (N.D.Miss.1993) (Davidson, J.). The court previously set out the relevant law concerning § 702c when it addressed the parties' pretrial motions. *See Arkansas River*, 840 F.Supp. at 1106–14. After a thorough discussion, this court noted which test it found to be proper when determining whether the Act's grant of immunity shielded the government from liability.

The court's understanding is that its inquiry should be focused on the operation, or not, of a flood control project for the maintenance of flood waters wherein some injury resulted to plaintiff. This is "the test", as discussed in *James*,[3] that the court will apply until there is further clarification by the Supreme Court or the Fifth Circuit to the contrary.

[3.] The *James* Court provided:

It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters *contained in or carried through*

*Arkansas River*, 840 F.Supp. at 1110 n. 10. Such clarification, either to the contrary or in affirmation, has not been forthcoming. Thus, the first query which this court must answer is whether the lock and dam serves a flood control role as a component of the McClellan–Kerr System, or whether its function is more narrowly defined as an instrument of passage for commercial river traffic. *Arkansas River*, 840 F.Supp. at 1113. Should the court find that Lock and Dam 4 operates as a federal flood control project, the court must then make a finding of causation before liability may attach to the United States. If the injury resulted "from or by floods or flood waters," the United States remains immune; if not, the shield is lifted.

As an aside, the court notes that the Act itself provides immunity "from or by floods or flood waters *at any place*," and does not limit its reach specifically to flood control projects. 33 U.S.C. § 702c (emphasis added). However, after interpreting the statute in light of its admittedly limited legislative history and the intent of Congress, this qualification was placed upon the United States by the courts, including the Fifth Circuit. *Graci v. United States*, 456 F.2d 20, 27 (5th Cir.1971); *see also Peterson v. United States*, 367 F.2d 271, 275 (9th Cir.1966). In *Graci*, the plaintiffs brought suit for property damage allegedly caused by the negligent construction of the Mississippi River–Gulf Outlet. *Id.* at 22. The United States conceded that the outlet was a navigation aid project, but argued that the Flood Control Act immunized it from the plaintiffs' claims for damages since the damages were incurred as the result of floodwaters. *Id.* The question facing the Fifth Circuit on appeal was whether § 702c afforded the government immunity from liability for floodwater damage unconnected with a flood control project. *Id.* at 23.

The *Graci* Court answered that query in the negative. "[W]hat little legislative history there is strongly support[s] the view that the purpose of § 3 [of the Flood Control Act] was to place a limit on the amount of money

a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.
478 U.S. at 605, 106 S.Ct. at 3121, 92 L.Ed.2d at 494 (emphasis added).

that Congress would spend in connection with flood control programs." *Id.* at 25. The court found it unreasonable to suppose that in exchange for entry into the flood control realm, the United States meant to provide a blanket of immunity for acts *unconnected* with flood control projects. *Id.* at 26. Relying upon these principles and the analysis utilized by sister circuits,[4] the Fifth Circuit held that

> § 3 is not a bar to claims for floodwater damage caused by the negligence of the Government unconnected with flood control projects.

*Id.* at 27. Since that time, every Fifth Circuit opinion addressing immunity under § 702c has linked that statutory buffer together with the "flood control" prerequisite. *Boudreau v. United States,* 53 F.3d 81, 82 (5th Cir.1995) (holding Lake Lewisville to be flood control project), *cert. denied,* —— U.S. ——, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996); *Mocklin v. Orleans Levee Dist.,* 877 F.2d 427, 428 (5th Cir.1989) (holding flotation channels part of flood control project); *Florida East Coast Ry. Co. v. United States,* 519 F.2d 1184, 1191 (5th Cir.1975) ("United States is protected from liability for damages caused by 'floods or floodwaters' in connection with flood control projects.").

The majority of other courts which have addressed this issue *post-James* have also concluded that, for immunity to attach, the injury must have occurred in connection with a flood control project. *See, e.g. Dawson v. United States,* 894 F.2d 70, 74 (3d Cir.1990) ("If waters contained in a federal flood control project for purposes related to flood control [are] a substantial factor in [causing] injuries, the immunity provision applies."); *Thomas v. United States,* 959 F.2d 232, 1992 WL 67789, **1 (4th Cir.1992) (unpublished opinion) ("It is clear under *James* that it is not relevant whether the waters of a flood

control project are used for multiple purposes, including recreation, so long as the water is being maintained as a flood control project."); *Cantrell v. United States,* 89 F.3d 268, 273 (6th Cir.1996) (holding plaintiff fails if trying to recover for injuries caused by government flood control activity, but noting plaintiff not per se loser in court if activity had nothing to do with flood control even if occurred on flood control project); *Bailey v. United States,* 35 F.3d 1118, 1122–23 (7th Cir.1994) (granting immunity if flood control activity increases probability of injury; leaving undecided whether suit actionable under FTCA if flood control activity does not increase likelihood of injury on flood control lake compared with natural lake); *Fisher v. United States,* 31 F.3d 683, 684 (8th Cir.1994) (holding § 702c applicable after stipulation that water was contained in flood control project but granting immunity only if government control of flood waters was substantial factor in causing injury); *McCarthy v. United States,* 850 F.2d 558, 562 (9th Cir.1988) (barring immunity only where injury wholly unrelated to management of flood control project), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *Holt v. United States,* 46 F.3d 1000, 1004 (10th Cir.1995) (noting two-prong test for immunity: 1) involvement of flood control project which triggers the act; 2) nexus between flood control activities and injuries); *Reese v. South Florida Water Mgt. Dist.,* 59 F.3d 1128, 1129–30 (11th Cir.1995) (interpreting *James* as extending immunity to multi-purpose flood control project irrespective of particular use of project at time of negligence).

The final affirmation that the umbilical cord of § 702c immunity must be attached to a flood control project comes from the Supreme Court in *James:*

---

**4.** *Peterson v. United States,* 367 F.2d 271, 275–76 (9th Cir.1966) (denying immunity for acts "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization"); *Parks v. United States,* 370 F.2d 92, 92 (2d Cir.1966) (affirming dismissal on immunity grounds after distinguish facts from *Peterson*); *McClaskey v. United States,* 386 F.2d 807, 808 n. 1 (1967) ("It does not follow that the mere hap-

pening of a flood insulates the Government from all damage claims flowing from it."); *Valley Cattle Co. v. United States,* 258 F.Supp. 12, 16 (D.Hawaii 1966) ("A reading of the Act and the cases interpreting it all show that the negation of liability of the United States contained in § 702c for flood damage was aimed at flooding occurring in areas involved in actual or potential flood control projects....").

It is thus clear from § 702c's plain language that the terms "flood" and "flood waters" apply to all waters *contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control.*

478 U.S. at 605, 106 S.Ct. at 3121, 92 L.Ed.2d at 494 (emphasis added). A footnote in that same opinion further illuminates the Supreme Court's interpretation of this issue. In response to an argument that immunity under § 702c only extends to projects authorized under the 1928 Flood Control Act, the Court recounted that

> Section 702c is not by its terms restricted to projects constructed under the 1928 Act. Nor would it make sense for the Federal Government to have immunity only for some, but not all, of its flood control projects.

*Id.* at 610 n. 10, 106 S.Ct. at 3123 n. 10, 92 L.Ed.2d at 497 n. 10.

While the courts agree that involvement of a flood control project is a prerequisite to the employment of § 702c immunity, their analyses of the appropriate nexus between the injury and flood control activity vastly differ. *Cantrell,* 89 F.3d at 272 ("In an effort to find a principled place to draw a line between significant and insignificant causal relationships, circuit courts have proposed a bewildering variety of linguistic tests.") (citing cases); *Bailey,* 35 F.3d at 1120 (noting lack of uniform analysis). This court is also somewhat puzzled by the circuits' myriad causal "tests," in particular that employed by the Fifth Circuit. *See, e.g., Boudreau v. United States,* 53 F.3d 81 (5th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996).

As noted *supra,* the Act grants immunity to the United States "for any damage *from or by floods or flood waters* at any place." 33 U.S.C. § 702c (emphasis added). Although the Fifth Circuit stated in *Boudreau* that its inquiry turned on this causation issue, the panel's analysis throughout the opinion implies that the court merely accorded lip service to the statutory language. 53 F.3d at 82–83. Daniel Boudreau and a friend experienced engine troubles with Boudreau's boat,

the SHAMAN, while they were out on Lake Lewisville, Texas. When the Coast Guard Auxiliary arrived to assist, Boudreau followed a crewmember's instructions and began lifting the anchor. During this lift attempt, the anchor line broke from its mount and swung into Boudreau's leg, causing severe injury.

Boudreau conceded that the lake upon which he was injured was a flood control lake. *Id.* at 82. Thus, the immunity prerequisite set out by the Supreme Court in *James,* that the water be contained in or carried through a federal flood control project, was met by stipulation. The Fifth Circuit never returned to the issue of causation, however. Instead, the court hinged its award of immunity to the United States upon a finding that the Coast Guard's involvement in the rescue attempt fell within the ambit of "management of a flood control project." *Id.* at 85 ("Such management is involved here."). Again, the Fifth Circuit lifted this language directly from *James* and apparently closed its eyes to the plain language of § 702c. *James,* 478 U.S. at 610, 106 S.Ct. at 3123, 92 L.Ed.2d at 496. As Judge Smith elucidated in his dissent,

> [t]he word "management" appears nowhere in the relevant provision of § 702c.... It is gleaned from the following passage in *James:*
>
> > [Plaintiffs] also argue, in the alternative, that even if 702c is intended to grant immunity in connection with flood control projects, the Federal government is not entitled to immunity here because their injuries arose from Government employees' alleged mismanagement of recreational activities wholly unrelated to flood control. In support of this argument they point to a "fundamental principle of immunity" that the "sphere or protected activity must be narrowly limited by the purpose for which the immunity was granted." *We think, however, that the manner in which to convey warnings, including the negligent failure to do so, is part of the "management" of a flood control project.* And as noted in n. 7, supra, the Court of Appeals found that the release of waters at

the [accident sites] was clearly related to flood control.

[478 U.S.] at 609–610, 106 S.Ct. at 3123–24 (emphasis added). Neither this passage nor the facts of *James* support the conclusion that a nexus between the damage and flooding has been jettisoned.

*Id.* at 87 (Smith, J., dissenting) (citing *James*).

The *Boudreau* Court never made a specific finding that the injury was caused by or from flood waters before awarding statutory immunity. In fact, the Fifth Circuit recognized the aperture created in the statutory language by its holding, yet shunned seeking a resolution to this interpretational conundrum of its own making. The panel noted "the suggestion by some courts that 'management of a flood control project' may well be insufficient, standing alone, to allow for § 702c immunity," *id.* at 85, and quoted a passage from the Seventh Circuit addressing the issue:

> The "management of a flood control project" includes building roads to reach the beaches and hiring staff to run the project. If the Corps of Engineers should allow a walrus-sized pothole to swallow tourists' cars on the way to the beach, or if a tree trimmer's car should careen through some picnickers, these injuries would be "associated with" flood control.... Yet they would have nothing to do with management of flood waters, and *it is hard to conceive that they are "damage from or by floods or flood waters"* within the scope of § 702c.

*Id.* (quoting *Fryman v. United States,* 901 F.2d 79, 81 (7th Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990)) (emphasis added). Although the court noted that it left resolution of this issue for another day, the majority skirted the causation re-

quirement set out in the statute—that the damage be caused "from or by floods of flood waters"—and instead spotlighted the distinction between *management* of a flood control project and *management* of flood waters.

> Here, we cannot say that Boudreau's injury has "nothing to do with management of flood waters." His injury resulted from a *boating* accident *on flood control waters* involving the *Government's patrol of those waters.* Assuming, without deciding, that something more is required in addition to "management of a flood control project," we are confident that, based on the facts at hand, this case meets the mark.

*Id.* at 86 (emphasis in original).

Under the facts of that case and the majority's holding, however, neither the trial court nor the Fifth Circuit made a specific finding that flood waters caused Boudreau's injury. Instead, the Fifth Circuit affirmed the lower court's grant of immunity after holding sufficient merely the fact that the accident occurred on what it held to constitute flood waters, and not that those flood waters completed the causal link.[5] Although the undersigned recognizes the broad language contained in § 702c and expounded upon by the Supreme Court in *James,* the plain language of the statute grants immunity "for any damage *from or by floods or flood waters,*" and not "for any damage related to the *management of a federal flood control project.*" *Boudreau,* 53 F.3d at 87 (Smith, J., dissenting) (noting that, in light of facts of *James* and plain language of § 702c, "[t]he predicate of the Court's ['management'] language was injuries plainly caused by flood waters.").

This is particularly interesting in light of the Fifth Circuit's opinion in *Mocklin v. Orleans Levee Dist.,* 877 F.2d 427 (5th Cir. 1989). In *Mocklin,* the plaintiff's young son died when he slipped from a sand bar and

---

5. In a footnote, the court expounded:

Although causation is disputed, the conditions on the Lake and the location of Boudreau's vessel certainly made an accident of this nature more probable. For example not only did the accident occur at a *flood control lake,* it occurred in an area that would not have been submerged without *flood control.* In this regard, the Government maintains that Boudreau's anchor was caught in trees beneath the

surface of the lake—trees submerged only as the result of *flood control.* Furthermore, it is evident from the record that the waves, high winds, and other conditions on the lake *could* have contributed to the accident.

*Boudreau,* 53 F.3d at 86 n. 15 (first emphasis added). It is clear the majority held as relevant the nexus "between the injury and 'flood control,' not flood waters." *Id.* at 86 (Smith, J., dissenting).

drowned. *Mocklin*, 877 F.2d at 428. The sand bar was created from the government's dredging of flotation channels. *Id.* The appellate court determined the following as its sole inquiry: "whether the Mocklins' son drowned 'from or by' 'flood water'" within the meaning of § 702c. *Id.* at 429. The court held that since the channels were indisputably part of a flood control project,[6] "[t]he inquiry ends then, and the Government is protected from 'any' liability *caused by these waters* as it was in *James*." *Id.* at 430 (emphasis added). Although the appellants attempted to distinguish the facts of *Mocklin* from those in *James*,[7] the court related that

> [w]hile in a different way from the prior case[ ] [*James*], it is clear here that the water in the flotation channel causally did contribute to the drowning of the Mocklins' son: the channel created a significant drop-off in the lake. This distinction then does not change the result of immunity under both situations. Under both situations, *the water can be said to have caused the injury.*

*Id.* (emphasis added). It appears to the undersigned that the Fifth Circuit disregarded its analysis in *Mocklin* with its holding and reasoning in *Boudreau.*

Fortunately, under the facts in the case *sub judice*, this court need not resolve this thorny causation problem due to its finding that the plaintiff's injuries were not related to the management of a federal flood control project nor caused by any flood control activity conducted by the government. Since the immunity provision has not been triggered in the first place, no resolution concerning the "cause" of the accident under the Flood Control Act need be attempted.

## FLOOD CONTROL PROJECT

As stated earlier, Lock and Dam 4 is part of an overall project named the McClellan–Kerr Arkansas River Navigation System ("McClellan–Kerr System"). From its name, one could logically deduce that the project's

purpose is navigational in nature. Although the United States attempted to prove otherwise, the court finds that Lock and Dam 4 is neither part of nor in itself a flood control project within the meaning of *James*, and thus that the immunity afforded the United States under § 702c is inapplicable in this case.

The majority of courts faced with determining whether a certain facility is in fact a flood control project begin their analysis with the legislative history pursuant to which the lock and dam was constructed and the actual purpose and character of the facility in question. *See, e.g., Mocklin v. Orleans Levee Dist.*, 877 F.2d 427, 429–30 (5th Cir.1989) (examining purpose of flotation channel before concluding dredging of channel was part of flood control project); *Graci v. United States*, 456 F.2d 20, 27 (5th Cir.1971) (holding facility unrelated to flood control to be navigation project); *Williams v. United States*, 957 F.2d 742, 743–45 (10th Cir.1992) (noting statutory history and testimony that lock and dam had no flood control capabilities supported finding that Lock and Dam 18 of **McClellan–Kerr Arkansas River Navigation System** was not flood control project); *Zavadil v. United States*, 908 F.2d 334, 335–36 (8th Cir.1990) (holding lake to be part of flood control project when one purpose was flood control and water level of lake monitored for flood control); *Fryman v. United States*, 901 F.2d 79, 80 (7th Cir.1990) (holding artificial lake created as part of flood control project subject to § 702c immunity); *McCarthy v. United States*, 850 F.2d 558, 562–63 (10th Cir.1988) (applying immunity to flood control project even though lake had multiple purposes; could not hold injury "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any action taken pursuant to such authorization"); *Powers v. United States*, 787 F.Supp. 1397, 1399 (M.D.Ala.1992) (noting query must focus on purpose of project au-

---

**6.** The parties conceded that the work, including the dredging, was part of a flood control project. *Mocklin*, 877 F.2d at 428 n. 1.

**7.** In the consolidated cases determined in *James*, the accidents resulted from unsafe water levels whereas the drowning in *Mocklin* did not occur

as the result of an increased water level. *Mocklin*, 877 F.2d at 430. The Fifth Circuit gave this argument little credence in light of its holding that the water at issue in *Mocklin* was flood water. *Id.*

thorized by Congress); *cf. Henderson v. United States,* 965 F.2d 1488, 1492 (8th Cir. 1992) (remaining silent on issue of whether facility was part of flood control project although noting dam created in part for flood control purposes; focusing instead on lack of nexus between injury and government control of flood waters).

The statutory history surrounding the appropriation of funds for the construction of the McClellan–Kerr System offers little guidance to the court in determining whether Congress intended to include Lock and Dam 4 as a "flood control project." The court previously quoted excerpts from the House and Senate reports on the Rivers and Harbors Bill of 1946 and the Preamble to the Public Law which authorized the McClellan–Kerr System, concluding that the navigational aspects of the project were featured more prominently than those of flood control. *Arkansas River,* 840 F.Supp. at 1110–11; H.R.Rep. No. 2009, 79th Cong., 2d Sess., at 28, 29 (1946); S.Rep. NO. 1508, 79th Cong., 2d Sess. at 32, 33 (1946); 60 Stat. 634, 635–36 (1946) (Ch. 595, Pub.Law 525, H.R. 6407, July 24, 1946).

This same is true of the majority of the exhibits offered by the parties during trial. *See, e.g.,* Exh. D–15, Technical Report No. 2-746, Oct. 1966 at 1 ("The 9–ft–deep channel will be provided by a system of locks and dams, some of which will be used not only for navigation, but also for the production of hydroelectric power."); Exh. D–18, Project Design Memorandum No. 3, Jan. 1960 at 1–4 (noting that most of the locks under consideration with regard to the Arkansas River were associated with navigation dams); Exh. D–20, Letter from Secretary of War, 1947 at 94 (noting primary purpose of plan for navigation and hydroelectric power); Exh. P–11, Letter from Col. Marvin W. Rees, Corps of Engineers, to Harold H. Brayman, Senior Staff Professional, United States Senate, Apr. 20, 1977 (listing McClellan–Kerr System with other Corps inland navigation projects with purposes of navigation, hydropower, water supply and recreation);

According to the testimony given and deposition evidence received during the trial of this matter, Lock and Dam 4 is not equipped with flood control facilities. Harold Hammersla, who testified by deposition, was the Corps resident engineer at the Pine Bluff resident office from September 1978 until his retirement in August 1992. When questioned about the flood control capabilities of Lock and Dam 4, Hammersla responded:

> Q: As I understand it—correct me if I'm wrong—Lock 4 has absolutely nothing to do with flood control.
>
> A: That is true.
>
> Q: By the same token, the dam at Lock 4 has nothing to do with flood control, does it?
>
> A: Not officially. I think unofficially, there may be some minor fluctuations they make in the dam.
>
> Q: But in any respect in laymen's language, Lock 4 is not going to prohibit any flooding or anything between the pools and—
>
> A: No. It's primarily a navigation structure.

Exh. P–42, Hammersla Depo., Oct. 19, 1994, at 5–6. Sam Rankin, an employee of the Corps for over twenty-five (25) years and the lockmaster of Lock 4 from 1988 to his retirement in 1994, testified in a similar vein.

> Q: The sole purpose of the locks and dams in that area is to assess navigation, isn't it?
>
> A: Right, maintain a certain draft. That's right.
>
> Q: And has absolutely nothing to do with flood control in there at [Locks] 3, 4, and 5, does it?
>
> A: No.

Exh. P–44, Rankin Depo., Oct. 20, 1994, at 8; *see also* Exh. P–45, Chappell Depo., Oct. 20, 1994, at 8–10 (averring lock and dam used solely for navigation purposes); Exh. P–46, Moore Depo., Oct. 19, 1994, at 16 (same); Exh. P–47, Marlow Depo., Oct. 19, 1994, at 27 (same).

Testimony of a corresponding genre was perpetuated by the live witnesses. When called as an adverse witness, Mr. Jack Woolfolk, an Assistant Chief of Engineering with the Corps during the relevant time at issue, testified that the sole purpose of the lock was

to aid navigation. Chester Shaw, the acting Corps Resident Engineer at the Pine Bluff office and also testifying as an adverse witness, agreed and affirmed that Lock and Dam 4 has no flood control capabilities and was not intended as a flood control project. *Arkansas River Co. v. United States,* No. 4:90cv240–D, Sept. 9, 1996 (Unofficial R. at 40). Similarly, Billy Harbison, the President of ARC and a thirty-year veteran Arkansas River boat operator, attested that Lock and Dam 4 was completely unrelated with flood control. *Arkansas River Co. v. United States,* No. 4:90cv240–D, Sept. 9, 1996 (Unofficial R. at 52). Indeed, the court can recall no weighty evidence to the contrary.

As such, the court finds that Lock and Dam 4 has no flood control capabilities and is not a flood control project. Based upon this finding, the court concludes that 33 U.S.C. § 702c does not preclude this court from exercising jurisdiction over the plaintiff's claims. The immunity provision set forth in § 702c has not been triggered and the court need not address this issue further.

## II. DISCRETIONARY FUNCTION EXCEPTION

■ As noted *supra,* the plaintiff brings its claims under the Suits in Admiralty Act ("SAA"). This Act is in effect a jurisdictional statute which allows admiralty suits encompassing all maritime torts alleged against the United States to be maintained against the United States. *Gordon v. Lykes Bros. S.S. Co.,* 835 F.2d 96, 98 (5th Cir.) (citing *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 176 n. 14, 96 S.Ct. 1319, 1326 n. 14, 47 L.Ed.2d 653 (1976)), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988). The Fifth Circuit has analogized the waiver of sovereign immunity contained in the SAA with the waiver set out in the Federal Tort Claims Act ("FTCA"). *Wiggins v. United States Through Dep't of Army,* 799 F.2d 962, 964–66 (5th Cir.1986); *see also Martin v. Miller,* 65 F.3d 434, 443 n. 4 (5th Cir.1995). In furtherance of that comparison, the Fifth Circuit has read into the SAA the discretionary exception contained in the FTCA to the immunity waiver. *Wiggins,* 799 F.2d at 966 ("[W]e join the virtually unanimous holdings

and reasonings of the other federal Courts of Appeals and recognize that a discretionary functions limitation is implicit in private suits brought against the United States Government under the Suits in Admiralty Act."). *See, e.g., Chute v. United States,* 610 F.2d 7, 13 n. 8 (1st Cir.1979); *Gercey v. United States,* 540 F.2d 536, 539 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977); *In re Joint Eastern & So. Dists. Asbestos Litig.,* 891 F.2d 31, 35 (2d Cir.1989); *Sea–Land Serv., Inc. v. United States,* 919 F.2d 888, 891 (3d Cir.1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *Gordon,* 835 F.2d at 98; *Gemp v. United States,* 684 F.2d 404, 408 (6th Cir.1982); *Bearce v. United States,* 614 F.2d 556, 559–60 (7th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); *In re Glacier Bay,* 71 F.3d 1447, 1450 (9th Cir.1995); *United States Fire Inc. Co. v. United States,* 806 F.2d 1529, 1534–35 (11th Cir.1986); *Canadian Transp. Co. v. United States,* 663 F.2d 1081, 1085–87 (D.C.Cir. 1980).

The FTCA provides for an exception to the broad waiver of immunity for torts alleged against the United States based on

> an act or omission of an employee of the Government ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion be abused.

28 U.S.C. § 2680(a). The Supreme Court has provided guidance to courts faced with determining whether an alleged governmental action is discretionary in nature and thus subject to immunity, or operational in character and not immune. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense,* 467 U.S. 797, 813–14, 104 S.Ct. 2755, 2764–65, 81 L.Ed.2d 660 (1984). First, the nature of the conduct, rather than the status of the actor, governs whether the exception applies. Courts must ascertain whether the challenged acts "are of the nature and quality that Congress intended to shield from tort liability." *S.A. Empresa,* 467 U.S. at 813, 104 S.Ct. at 2765. Second, the exception encompasses discretionary acts of the gov-

ernment in regulation of private individual's conduct. *Id.* "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.

■ The issue in this case concerning the applicability of the discretionary function exception is a factual one: whether the misalignment of the GREENVILLE and its subsequent allision with Lock and Dam 4 was caused by some protrusion on the right bank for which the Corps had a responsibility to remove.[8] ARC has conceded on numerous occasions that the site selection and design of the lock and dam involve discretionary acts and policy considerations and thus fall within the exception. *Arkansas River,* 840 F.Supp. at 1115; Plaintiff's Proposed Findings of Fact and Conclusions of Law at 22; Plaintiff's Supplemental Proposed Findings of Fact and Conclusions of Law at 18. The basis for ARC's claim is that the Corps had a duty to use due care in the maintenance and operation of the facility and that the Corps breached that duty with regard to the right bank. The undersigned has previously concluded that "the government's alleged failure to employ due diligence in maintaining and inspecting the lock and dam, once constructed, is not excused under the discretionary umbrella." *Arkansas River,* 840 F.Supp. at 1115.[9] Thus, if the plaintiff proved that the condition of the right bank was an outgrowth of the Corps' dereliction of duty and that such condition causally contributed to the allision, the exception to the waiver of immunity would not apply and this court would have subject matter jurisdiction. *McNeily v. United States,* 6 F.3d 343, 347 (5th Cir.1993) (noting district court lacks subject matter jurisdiction where discretionary function exception applies); *FDIC v. Irwin,* 916 F.2d 1051, 1052 (5th Cir.1990) (same).

The court finds that the Corps did not breach its duty of due care in the maintenance of the right descending shore line and that this court thus lacks jurisdiction with respect to the plaintiff's claims. The plaintiff's theory is that an outcropping of rock or some other material on the right bank precipitated an outdraft in the river current which in turn pushed the GREENVILLE's tow head to the port resulting in the allision with the lock's guide wall and the dam. The evidence presented during the trial of this matter overwhelmingly indicated the presence of an outdraft upstream to Lock and Dam 4. However, the court is unconvinced that the outdraft was caused by some projection or rocky point on the right bank and not by the overall contour of the shoreline itself.[10] The court listened to the testimony and has also reviewed the exhibits offered by the parties depicting the shoreline, particularly the aerial photographs. Exhs. D-1 through D-9. The undersigned is simply not persuaded that any such outcropping existed in April 1990, much less that a rocky point gradually occurred over the years strengthening the outdraft and that the Corps breached its duty of due care by failing to straighten out the bank.[11]

---

**8.** The court need not address at this juncture the alleged negligence of Captain Wayne Stricklin, the pilot of the GREENVILLE at the time of the allision. The court must first determine whether it has subject matter jurisdiction over the plaintiff's claims.

**9.** *See also Arkansas River Co. v. CSX Transp.,* 780 F.Supp. 1138, 1140 (W.D.Ky.1991); *Complaint of Walker's Midstream Fuel,* 636 F.Supp. 339, 349 (W.D.Ky.1986).

**10.** Furthermore, according to the testimony given at the trial, the majority of the locks and dams on the McClellan–Kerr System experience outdrafts upstream to the final lock approach.

**11.** The plaintiff's own expert, Captain Will Horton, testified that, in his opinion, the cause of the

GREENVILLE allision was the outdraft *and the configuration of the bank. Arkansas River Co. v. United States,* No. 4:90cv240–D, Sept. 9, 1996 (Unofficial R. at 81–82). He averred that had Captain Stricklin had room to maneuver, he could have realigned his tow and avoided the allision. Captain Horton stressed that in his opinion the channel of Lock and Dam 4 was more narrow than it should have been, more narrow than other locks. *Id.* (Unofficial R. at 84–86). However, the maneuverability room, or lack thereof, is a result of the site and design of the lock and dam—discretionary decisions. The Corps did straighten out the right bank in 1993, thus widening and straightening the approach to Lock and Dam 4. However, the fact that the Corps undertook such an excavation in 1993 in no way rends the immunity provided the government for its discretionary decision to place the

The court finds that the outdraft and subsequent alignment problems were not caused by any protrusion on the right descending bankline for which the Corps had a responsibility to remove and straighten. It follows from that finding that the Corps did not breach its duty of due care in maintaining the facility in question. The court finds that the outdraft and allision were caused by the natural configuration of the shoreline and lack of room in which to maneuver the tow. These causation predicates are the result of the discretionary decision of the government in designing and placing Lock and Dam 4 where it is presently located on the Arkansas River. This court is thus without subject matter jurisdiction over the plaintiff's claims due to the discretionary exception implied in the Suits in Admiralty Act.

## III. GOVERNMENT'S COUNTER-CLAIM

The United States has counter-claimed for damages resulting to Lock and Dam 4 subsequent to the GREENVILLE allision under the Rivers and Harbors Act, 33 U.S.C. §§ 408, 412, and the Inland Navigational Rules, 33 U.S.C. §§ 2001 *et seq.*

### A. RIVERS AND HARBORS ACT

■ The Rivers and Harbors Act provides in relevant part:

It shall not be lawful for any person or persons to ... alter, deface, destroy, move, injure, ... or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States ... for the preservation and improvement of

any of its navigable waters or to prevent floods....[12]

33 U.S.C. § 408.

And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof.

33 U.S.C. § 412. The Fifth Circuit has interpreted these two statutes as providing for strict liability. *United States v. Tug Colette Malloy,* 507 F.2d 1019, 1022 (5th Cir.1975); *see also United States v. American Commercial Barge Line Co.,* 988 F.2d 860, 861–62 (8th Cir.1993); *Chotin Transp., Inc. v. United States,* 819 F.2d 1342, 1348–50 (6th Cir. 1987) ("[S]trict liability under ... the Rivers and Harbors Act arises from a violation of the ... statutes and not from common law tort negligence...."); *United States v. Central Soya, Inc.,* 697 F.2d 165, 168 (7th Cir. 1982) ("There is no requirement that negligence be shown...."). In addition, the only defense recognized in this circuit is the "sole cause defense." *Id.* (refusing to deem as a defense garden-variety contributory negligence); *accord Central Soya,* 697 F.2d at 169 n. 4. Only if some negligence of the United States was the sole cause of the allision in question may ARC avoid liability to the United States for the damage the GREENVILLE and its barges visited upon Lock and Dam 4.[13]

lock and dam where it did with the original widths structured by the shoreline.

**12.** The court finds as a matter of law that Lock and Dam 4 falls within the definition of a "work" for the preservation and improvement of navigable waters in the United States. The parties did not contest this fact as evidenced by the Pretrial Order, Nov. 3, 1995, at 9.

**13.** The court acknowledges that the statute in question, 33 U.S.C. § 412, provides for an action

to be brought against a "boat, vessel, scow, raft or other craft." The court holds that it may exercise *in rem* jurisdiction over the GREENVILLE for the United States' claim under this statute. *United States v. Republic Marine, Inc.,* 829 F.2d 1399, 1403 (7th Cir.1987) ("Once a person, or here a vessel, requests a court to exercise judicial authority in its behalf on the merits of a case, that person or vessel has effectively appeared in the case.") (citing *Cactus Pipe & Supply Co. v. M/V Montmartre,* 756 F.2d 1103, 1108 (5th Cir.1985)); Plaintiff's Proposed Findings of Fact and Conclusions of Law at 26. To

The court is unable to say that any negligence of the United States was the sole cause of the allision. On the other hand, Robert W. Woolems, the lock and dam operator on April 22, 1990, the date of the allision, testified that the GREENVILLE twice became misaligned upstream to Lock and Dam 4, before the final disarrangement from which the tow could not recover. *Arkansas River Co. v. United States,* No. 4:90cv240–D, Sept. 9, 1996 (Unofficial R. at 144–45). Captain Will Horton, one of the plaintiff's experts, testified that Captain Stricklin could have avoided the allision if he had had sufficient room to back his tow out of danger. However, Captain Stricklin was aware of how narrow the lock channel was and its subsequent lack of maneuvering room. Indeed, he had successfully locked through Lock 4 earlier in April.

When the GREENVILLE attempted to lock through on April 22, 1990, however, the flow rate was much higher than it had been earlier that month. It was approximately 220,000 CFS compared with the earlier flow rate of approximately 180,000 CFS. The court is of the opinion that the higher flow rate increased the effect of the outdraft and contributed to the allision. Furthermore, the tow was carrying eight (8) barges and the court finds persuasive Mr. Woolems' testimony that the load was too weighty and unwieldy for such a high flow rate in Lock and Dam 4's narrow channel. In any event, the court notes again that there is no requirement for a finding of negligence due to the Act's imposition of strict liability. *United States v. Republic Marine, Inc.,* 829 F.2d 1399, 1405–06 (7th Cir.1987) ("Thus if the defendant vessel[ ] here and the government both acted nonnegligently, Congress has under this strict liability provision placed the liability entirely upon the defendant vessels."). The court finds that the GREENVILLE violated the Rivers and Harbors Act by damaging Lock and Dam 4, that the "sole cause" defense offers the GREENVILLE no reprieve and that the GREENVILLE is strictly liable for the stipulated damages to the lock and dam in the amount of $53,202.00 plus prejudgment interest accruing from the date of the allision.[14] *See* Exh. P–36; *Gulf Oil Corp. v. Panama Canal Co.,* 481 F.2d 561, 570 (5th Cir.1973); *American Commercial,* 988 F.2d at 863 ("In admiralty cases, prejudgment 'interest should be granted unless there are exceptional or peculiar circumstances.' "); *United States v. Peavey Barge Line,* 748 F.2d 395, 401–03 (7th Cir.1984).

## B. ALTERNATIVE BASES FOR LIABILITY

Because the court finds the plaintiff strictly liable under the Rivers and Harbors Act, it declines to address the remaining theories under which ARC and the GREENVILLE could be held accountable for the damage done to Lock and Dam 4.

## CONCLUSION

The court finds that Lock and Dam 4 is not a flood control project and therefore the United States is not entitled to the immunity set forth in the Flood Control Act. However, the court concludes that the discretionary function exception is applicable to the plaintiff's claims under the Suits in Admiralty Act and precludes this court from exercising jurisdiction over those claims. Finally, the court finds ARC and the GREENVILLE strictly liable under the Rivers and Harbors Act for the damage the allision on April 22, 1990, caused Lock and Dam 4. The parties stipulated to damages to Lock 4 in an amount of $102,952.00 and the court shall further award prejudgment interest on that amount accruing from April 22, 1990.[15]

avoid redundancy, the court includes the GREENVILLE under this section when it refers to ARC for liability purposes.

14. The Fifth Circuit interestingly noted in one of the few cases wherein the Rivers and Harbors Act is discussed:

Failing to escape liability, defendants contend that the United States should be required to indemnify them pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., and the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Indemnification would undermine the strict liability imposed by the statutes; we refuse to grant it here.

*Tug Colette,* 507 F.2d at 1023.

15. The United States was less than clear in making its request for damages. The court takes the uncontested amount of $102,952.00 from page

A separate order in accordance with this opinion shall issue this day.

### ORDER AND FINAL JUDGMENT

Pursuant to a bench opinion entered this day, the court ORDERS and DECREES that:

1) the claims of the plaintiff, Arkansas River Company, a corporation, as operator and/or owner *pro hac vice* of the M/V GREENVILLE, against the defendant United States of America be, and they are hereby, DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

2) the plaintiff Arkansas River Company, a corporation, as operator and/or owner *pro hac vice* of the M/V GREENVILLE shall pay to the defendant United States of America damages in the amount of $102,952.00 plus prejudgment interest accruing at the regular federal rate from April 22, 1990.

six (6) of the Pretrial Order. This amount was stipulated as the Corps' cost to repair the physical damage to Lock 4. At the end of the trial, the United States withdrew its request for an additional $100,000.00 for the emergency placement of riprap rock against the dam where one of the GREENVILLE's barges had sunk and amended the amount sought for these damages to $53,-000.00. *See* Exh. P–36 (plaintiff's exhibit setting forth total cost of emergency riprap as $53,-

202.00). The United States failed to convince the court, however, that the placement of the riprap rock against the dam was either immediately necessary after the GREENVILLE allision or what amount, if any, could be attributable to the GREENVILLE allision as compared to previous accidents. Thus, the court finds that the United States is not entitled to an award of damages for the emergency riprap rock placed around the dam.